UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| AMORITA N. THOMAS, on behalf of<br>Herself and all others similarly-situated, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:08-cv-0667-DFH-DML |
| | ) | |
| H&R BLOCK EASTERN ENTERPRISES,<br>INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The Indiana Wage Payment Statute, Indiana Code § 22-2-5-1, requires
employers to pay employees "all wages earned to a date not more than ten (10)
business days prior to the date of payment." Plaintiff Amorita Thomas alleges that
her former employer, defendant H&R Block Eastern Enterprises, Inc., failed to pay
"end-of-season compensation" within ten days after it was earned. Thomas seeks
to represent a plaintiff class with similar claims, though the court has not yet
certified a class. This court has original jurisdiction over the action under
28 U.S.C. § 1332(d)(2).


The parties agree that H&R Block paid Thomas her hourly wages correctly
and on time. They also agree that it paid Thomas her end-of-season
compensation as calculated correctly and on the schedule that H&R Block

promised, just a few days beyond the ten-day deadline in the statute.  The parties disagree on whether the end-of-season compensation was subject to the ten-day deadline under the statute.  H&R Block has moved for summary judgment on that issue.  After reviewing the parties' submissions and the applicable law, the court grants defendant's motion because the undisputed facts show that the end-of-season compensation was not a wage subject to the ten-day limit.

*Standard for Summary Judgment*

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment is appropriate when there are no genuine issues of material fact, leaving the moving party entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c).  The moving party must show that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party need not positively disprove the opponent's case; rather, it may prevail by establishing the lack of evidentiary support for that case.  *Id.* at 325.  Where the non-moving party bears the burden of proof on an issue at trial and the motion challenges that issue, the non-moving party must set forth specific facts showing that there is a genuine issue for trial.  See Fed. R. Civ. P. 56(e)(2); *Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir. 1999).  "Bare allegations not supported by specific facts are not sufficient in opposing a motion for summary judgment."

*Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1027 (7th Cir. 2004), quoting *Hildebrandt v. Illinois Dep't of Natural Resources*, 347 F.3d 1014, 1036 (7th Cir. 2003).

A factual issue is material only if resolving the factual issue might change the suit's outcome under the governing law. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. *Id.* In deciding a motion for summary judgment, a court may not assess the credibility of witnesses, choose between competing inferences, or balance the relative weight of conflicting evidence; the court must view all the evidence in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party. *Anderson*, 477 U.S. at 255.

*Undisputed Facts*

In accord with the summary judgment standard, the facts stated below are not necessarily true in an absolute sense, but they are either undisputed or reflect the admissible evidence in the light reasonably most favorable to Thomas, the non-moving party. Facts adverse to Thomas that H&R Block has established beyond reasonable dispute are included.

In 2004, plaintiff Thomas began working for H&R Block as a seasonal employee.  Complaint ¶ 16.  A seasonal employee for H&R Block is employed only during the tax season, which typically runs from December to mid-April.  Def. Exs. B ¶ 2, Ex. C ¶ 2.  In 2006 and 2007, Thomas entered into a Tax Professional Employment Agreement and worked for defendant as a Tax Professional II.  Def. Exs. B, C.  The agreements set forth the terms and conditions of Thomas' seasonal employment.  A Tax Professional II is responsible for preparing complete and accurate tax returns for clients and for offering H&R Block's other financial products and services to clients.  Atkinson Dep., Ex. 1, § 1.  The Tax Professional Employment Agreements for 2006 and 2007 stated that Thomas would be paid an hourly wage and was eligible for overtime pay.  Def. Ex. B ¶ 4, Ex. C ¶ 4.  During 2006 and 2007, Thomas was paid her hourly wages in a timely manner on a bi-weekly basis.  Def. Ex. I.

In 2006 and 2007, Thomas was eligible for "end-of-season compensation." The terms and conditions regarding the "end-of-the season compensation" were set forth in the "Compensation Information Sheet."  See Def. Exs. E, F.  H&R Block told Thomas that she would be eligible for "Additional Compensation" if the aggregate of a number of specified amounts exceeded her aggregate gross hourly wages paid for the tax season.  Hourly wages for certain training were excluded from the calculation.  The specified amounts included a few dollars for each product sold by the employee during the tax season, a fee for each tax return Thomas prepared (with a sliding scaled tied to the total fee the customer paid),

based on total fees "charged to the client and collected by H&R Block during the Tax Season."  Def. Ex. E ¶ 4, Ex. F ¶ 4.  The specified amounts also included certain client retention incentives when a customer whom the employee served the prior tax year returned to H&R Block, even if Thomas did not do the work on the customer's tax return. *Id.* at ¶ 5.  H&R Block also promised to pay additional amounts based on prior experience and professional certifications.  *Id.* at ¶¶ 6,7.

Thomas was eligible for "end-of-season compensation" only if the aggregate fees earned on products and services located in the 2006 and 2007 Compensation Information Sheets exceeded the gross hourly wages paid to her during those respective tax seasons.  *Id.* at 1.  Plaintiff was to be paid for all returns and CODs[1] collected by H&R Block through April 21, 2006 and April 18, 2007.  All gross hourly wages earned from the beginning of the tax season through April 21, 2006 and April 20, 2007 were included in the "end-of-season compensation" calculation.  Def. Exs. J, K.

The Compensation Information Sheets provided that no end-of-season compensation would be paid if the employee was terminated for cause, and that H&R Block retained "the sole and final discretion" to interpret the document, so that the company's calculations of end-of-season compensation would be final and binding.  The documents said that the end-of-season compensation would be paid

[1]A "COD" is a tax return that needs to be picked up and/or paid for by the client.  Atkinson Dep. 123.

by May 12, 2006 and by May 14, 2007 "or as soon thereafter as is reasonable under the circumstances."  Ex. E, Part 6 ¶ 3; Ex. F, Part 5, ¶ 4.

During most of the tax season, plaintiff could run "Estimated Compensation Reports" to view daily snapshots of her accumulated compensation.  Atkinson Dep. 132-33.  The Estimated Compensation Reports included all of the products or services listed in Part 1 of the Compensation Information Sheet, but they did not include all of the data needed to determine the final number for end-of-season compensation.  Atkinson Dep. 123, 132-33; see Atkinson Dep. Ex. 11; Def. Exs. E, F, G, H.  On April 22, 2006 and April 21, 2007, payroll processing for hourly wages for the final pay period of the respective tax seasons began.  Def. Ex. J, sec. 3, ¶ 24; Ex. K, sec. 3, ¶ 24.  On April 23, 2006 and April 22, 2007, the payroll processes were completed.  On the same days, the payroll was mailed to ADP, which printed and mailed defendant's payroll checks.  Atkinson Dep. 166, 202.  Employee checks were available for deposit on April 26, 2006 and April 25, 2007.  Def. Ex. J, sec. 3, ¶ 35; Ex. K, sec. 3, ¶ 32.

Between April 24 and April 26, 2006 and April 23 and April 25, 2007, "Clicks and Mortar," "Client Retention," and "Bonus Summary Reports" were linked and loaded into the Financial Information Network (FIN).  Def. Ex. J, sec. 3, ¶¶ 25, 26, 27, 29, 31; Ex. K, sec. 3, ¶¶ 28, 30, 31, 38, 39.  On April 26, 2006 and April 25, 2007, district bookkeepers and managers began entering end-of-season compensation information into the FIN.  Def. Ex. J, sec. 3, ¶ 37; Ex. K, sec.

3, ¶ 40.  May 1, 2006 and May 1, 2007 were the deadlines for entering all of the compensation information into the payroll system.  Def. Ex. J, sec. 3, ¶¶ 42, 43; Ex. K, sec. 3, ¶ 49.  On the same days, the Employee Compensation Reports for the 2006 and 2007 tax seasons were created.  Def. Reply Br. Appx. B ¶ 25; Def. Ex. H.

After reconciliation periods beginning on May 1, 2006 and May 2, 2007, payroll processing for the end-of-season compensation began on May 4, 2006 and 2007.  Def. Ex. A ¶¶ 19-20; Ex. J, sec. 3, ¶¶ 44, 46; Ex. K, sec. 3, ¶¶ 51, 53.  ADP mailed compensation checks on May 8, 2006 and May 9, 2007 with an issue date of May 10, 2006 and May 11, 2007.  Atkinson Dep. 87, 206.  Def. Ex. J, sec. 3, ¶ 51; Ex. K, sec. 3, ¶ 60.  Plaintiff was paid her "end-of-season compensation" via direct deposit on May 10, 2006 and May 11, 2007.  Def. Ex. I.

For the 2006 tax season, H&R Block calculated end-of-season compensation for approximately 78,000 tax professionals in the United States and actually paid compensation to approximately 54,000, of whom 1,426 worked in Indiana.  For the 2007 tax season, H&R Block calculated end-of-season compensation for approximately 80,000 tax professionals in the United States and actually paid compensation to approximately 56,000, of whom 1,437 worked in Indiana.  Atkinson Aff. ¶¶ 8-11.  The evidence before the court shows that the calculations and processing of end-of-season compensation payments were done on an expedited basis and took a great deal of overtime.  Atkinson Aff. ¶¶ 18; Atkinson

Dep. 166.   JoAnn Atkinson, director of H&R Block's administrative center, testified that she did not believe it would be possible to have calculated and paid the end-of-season compensation within ten days of the close of the tax seasons because of the need to have final payroll numbers, and the volume and complexity of the calculations, which required reconciliation by hand of a number of errors that occured in the record-keeping.   Atkinson Aff. ¶ 26; Atkinson Dep. 206. During Atkinson's deposition, plaintiff asked how long it would have taken to process the payments for Indiana tax professionals if they had been "put to the front of the line" or if Indiana had been done first.   Atkinson said that she did not know.   Atkinson Dep. 179, 210.

*Discussion*

Plaintiff Thomas is suing H&R Block for violating the Indiana Wage Payment Statute, Indiana Code § 22-2-5-1, by not paying the end-of-season compensation within the ten-day limit in the statute.   The Indiana Wage Payment Statue states in relevant part:

> (a)   Every person, firm, corporation . . . doing business in Indiana, shall pay each employee at least semimonthly or biweekly, if requested, the amount due the employee.
>
> (b)   Payment shall be made for all wages earned to a date not more than ten (10) business days prior to the date of payment . . . .

Ind. Code § 22-2-5-1.   The central issue here is whether H&R Block's "end-of-season compensation" constitutes a "wage" under the Indiana Wage Payment

Statute.  If so, then the compensation should have been paid by defendant on May 5, 2006 instead of May 10, 2006 and on May 4, 2007 instead of May 11, 2007.  The remedy for a delayed payment of "wages" is liquidated damages of 10 percent per day, up to 200 percent of the amount due, plus attorney fees and costs.  Ind. Code § 22-2-5-2.

The Indiana Wage Payment Statute does not provide a statutory definition of wages, but the Indiana Supreme Court has used the definition from the closely related Indiana Wage Claims Statute, Ind. Code § 22-2-9-1(b), which requires employers to make prompt payment of wages due upon termination of employment.  See Ind. Code § 22-2-9-2; *Highhouse v. Midwest Orthopedic Inst., P.C.,* 807 N.E.2d 737, 739 (Ind. 2004).  Under section 22-2-9-1(b), wages mean "all amounts at which the labor or service rendered is recompensed, whether the amount is fixed or ascertained on a time, task, piece, or commission basis, or in any other method of calculating such amount."

The court avoids characterizing H&R Block's end-of-season compensation as commissions (as Thomas does) or as bonuses (as H&R Block does).  The parties' label for a form of compensation does not control the application of the Wage Payment Statute.  The substance of the arrangement governs the question. See, *e.g.*, *Kopka, Landau & Pinkus v. Hansen*, 874 N.E.2d 1065, 1072 (Ind. App. 2007); *Gurnik v. Lee*, 587 N.E.2d 706, 709 (Ind. App. 1992).

The statutory language by itself does not provide a clear answer for the treatment of H&R Block's end-of-season compensation, so the court turns to the Indiana courts' treatment of the statute as applied to a variety of similar compensation arrangements.   In considering a question of state law in this diversity jurisdiction case, the court must decide the question as it predicts the Indiana Supreme Court would decide it if the case were before it today.  *Woidtke v. St. Clair County*, 335 F.3d 558, 562 (7th Cir. 2003).  If the state's highest court has not ruled on an issue, intermediate appellate decisions ordinarily provide a strong indication of how the highest court would rule unless there is a persuasive reason to believe otherwise.  *Research Systems Corp. v. IPSOS Publicite,* 276 F.3d 914, 925 (7th Cir. 2002).

Indiana courts continue to wrestle with the definition of wages as applied to a host of different compensation arrangements. *Highhouse* provides the Indiana Supreme Court's guidance on this statute, and the case requires close attention. Highhouse was an orthopedic surgeon who joined a practice as an employee with a base annual salary of $250,000.  His contract provided for an "annual bonus" for each calendar year payable at the end of February of the following year.  The annual bonus was to be based on the practice's total collections, less an allocation for expenses of overall operations.  807 N.E.2d at 738.  The evidence showed that the bonus was actually paid each quarter based on quarterly financial results. After the plaintiff resigned, the employer refused to pay any further bonus amount based on the collections from the plaintiff's work performed before he resigned.

The plaintiff sued for breach of contract and under the Wage Payment Statute. The Indiana Court of Appeals held that the plaintiff was entitled to a properly calculated bonus as a matter of contract law.  Because the bonus was a part of Highhouse's compensation under his employment agreement, the Court of Appeals also held that the bonus amounted to wages under the statute.  782 N.E.2d 1006, 1013-14 (Ind. App. 2003).

The Supreme Court affirmed on the breach of contract claim but reversed and ordered summary judgment in favor of the employer on the statutory claim. The court accepted the general definition of wages, so that a bonus is a wage if it "directly relates to the time that an employee works, is paid with regularity, and is not dictated by the employer's financial success."  807 N.E.2d at 739.  The bonus depended on Highhouse's own efforts but also on the collection of accounts and the overall expenses for the business.  The court cited with approval an earlier case holding that a bonus that depended on the overall financial success of the employer was not a wage.  *Id.* at 740, citing *Pyle v. National Wine & Spirits Corp.*, 637 N.E.2d 1298, 1300 (Ind. App. 1994).  Highhouse's annual bonus that depended on the expenses of the employer's overall operations had the same problem and thus did not qualify as a wage.  *Id.*

The Supreme Court went further in *Highhouse* to explain that practical considerations also weighed against treating the bonus as a wage.  A bonus tied to overall financial results of the employer did not seem consistent with the short

-11-

time constraints for paying wages under the statute.  Although parties cannot agree to exempt themselves from the law, the fact that the parties had agreed to an annual payment lent support to "the view that both parties recognize that frequent calculation and payment was difficult if not impossible." *Id.*

Following *Highhouse*, the Indiana Court of Appeals and federal courts in Indiana have held that similar payment arrangements that depended on contingencies other than the employees' own efforts were not wages under the statute.  In *Kopka, Landau & Pinkus v. Hansen*, 874 N.E.2d 1065 (Ind. App. 2007), an associate in a law firm was entitled to "business development commissions" that were based on ten percent of actual collections from clients.   The commissions were paid monthly.   After the associate resigned, the law firm refused to pay any further business development commissions.  The trial court had found that the departing associate was entitled to $27,000 in commissions, and treated the commissions as wages that had to be paid within ten days, awarding the departing associate $81,000.  The Indiana Court of Appeals held that the failure to pay was a breach of contract but reversed on the statutory claim and the liquidated damages.  The appellate court followed *Highhouse* and held that the contingency of collection from the clients and the less frequent schedule of payments meant that the commissions were not wages within the meaning of the statute.  *Id.* at 1073-74; accord, *Davis v. All American Siding & Windows, Inc.*, 897 N.E.2d 936, 944 (Ind. App. 2008) (affirming in part summary judgment for employer where commissions were based on profitability of

employee's projects, which could not be determined at time wages were owed); *Rumler v. General Revenue Corp.*, 2007 WL 1266747, *5 (S.D. Ind. May 1, 2007) (Tinder, J.) (granting summary judgment for employer where bonus depended on employer's success in collecting payments); *Degani v. Community Hospital*, 2005 WL 2591902, *11-12 (N.D. Ind. Oct. 12, 2005) (same); *Gress v. Fabcon, Inc.*, 826 N.E.2d 1, 4 (Ind. App. 2005) (affirming summary judgment for employer where commissions depended on profitability of employee's projects, which was determined less frequently than wages were paid).

Under the reasoning of *Highhouse* and these cases interpreting it, H&R Block's end-of-season compensation did not qualify as a wage under the Indiana Wage Payment Statute. First, the payments depended not only on the employee's own efforts but were subject to the contingency of payment by the customer. Second, the compensation was calculated only once a year, encompassing financial results for the entire tax season. Third, the compensation was paid in addition to regular hourly wages. (Contrary to plaintiff's argument, the hourly compensation cannot be characterized accurately as just a "draw" against commissions. An employee whose end-of-season calculation showed an amount less than the adjusted total of her hourly wages was not required to pay H&R Block any shortfall. The end-of-season compensation was payable only if the number exceeded the employee's adjusted hourly earnings during the season.) Finally, although H&R Block provided estimates of end-of-season compensation throughout the tax season, the final calculations had to await the final regular pay

calculations.  After those were complete, the company had to go through a further elaborate reconciliation process that covered data from the entire tax season.  The court is not determining as a matter of law that it would have been literally impossible for H&R Block to calculate, reconcile, and then pay the end-of-season compensation within ten days after the last pay period of the tax season ends. But the obvious difficulty of doing so and the once-a-year schedule weigh heavily against treating this annual compensation as a wage for purposes of the Wage Payment Statute.  See *Highhouse*, 807 N.E.2d at 740.

It is well established, of course, that an employer cannot avoid the Wage Payment Statute by having the employee agree to a different and slower schedule for payment.  *E.g.*, *Highhouse*, 807 N.E.2d at 740.  But in borderline cases, the agreed schedule for an unusual payment, outside the usual course of wage payments, provides a relevant indication of whether the payment should be treated as wages subject to the statute.  See *id.*

Plaintiff has argued that there are disputed issues of fact concerning H&R Block's ability to comply with the ten-day requirement under Indiana law.  She points out that if H&R Block could complete the calculations for all tax professionals in the United States within fifteen days, it should have been able to complete the work for only the Indiana tax professionals well within the ten-day deadline if it concentrated on doing the Indiana employees' calculations first.  This argument misses the point.  In *Highhouse*, the Indiana Supreme Court did not

adopt a standard of literal impossibility in holding that the doctor's annual or quarterly bonuses were not wages.  A standard of literal impossibility would invite sterile litigation over highly speculative possibilities, such as those suggested by plaintiff here:  what if H&R Block had done the calculations for Indiana employees first, before doing anyone else's calculations?  Rather, the *Highhouse* court pointed out "the provision for annual payments lends support to the view that both parties recognize that frequent calculation and payment was difficult if not impossible." 807 N.E.2d at 740.  Recall that *Highhouse* adopted a definition of wages that included a bonus if it was "paid with regularity."  *Id.* at 739.  The H&R Block end-of-season compensation was paid in addition to regular wages, was calculated only once each year, and required an accumulation of data from the entire season, as well as demanding and complex calculations and reconciliations of data.  The undisputed facts show that this end-of-season compensation was not a wage subject to the ten-day payment requirement of the Indiana Wage Payment Statute.

To oppose this result, plaintiff relies most heavily on *J Squared, Inc. v. Herndon*, 822 N.E.2d 633, 640-41 (Ind. App. 2005).  In that case, the employee had been hired to sell furniture in large blocks, primarily to colleges and universities for use in dormitory rooms.  His contract provided for a two percent commission "on every order that has shipped, installed, and is paid in full."  He was given a draw against commissions but would be obliged to pay back any deficit if he failed to generate enough commissions to cover his draw.  The employee resigned and demanded that he be paid commissions on his orders that

were shipped and paid after his resignation, which usually occurred months after the order was placed.   The employer refused to pay any post-resignation commissions.   The trial court held that the commissions were wages and that the failure to pay promptly after the customers paid for the plaintiff's orders violated the Indiana Wage Claims Statute (not the Wage Payment Statute).   The Court of Appeals affirmed, but without discussing *Highhouse*, which had been decided eight months earlier.   The Court of Appeals reasoned that the employee had a vested right to the commissions when the orders were accepted, but that the right to payment was deferred until the orders were shipped and the customers paid for them.   822 N.E.2d at 641.

It is difficult to reconcile the reasoning of *J Squared v. Herndon* with *Highhouse* and its progeny, but there are two key factual differences between this case and *J Squared*.  First, the commissions in *J Squared* were not only a regular part of the plaintiff's compensation – they *were* his compensation.  He took a draw against commissions, but he was obligated to make up any shortfall.  For plaintiff Thomas in this case, the end-of-season compensation is a supplement to the regular wages that were paid biweekly.   She was not required to make up any shortfall if her end-of-season compensation calculation had turned out to be less than she had been paid in regular wages.  Second, the commissions in *J Squared* were due when the customers paid for their orders, on a rolling basis, as distinct from the once-a-year compensation at issue here, which required special and elaborate calculations based on the results of the entire annual tax season.  There

is also the legal difference. *J Squared* was decided under the Indiana Wage Claims Statute, which applies when an employee is fired. It is not clear how much weight that factor deserves, but even if those differences were not sufficient, the fact that *J Squared* did not address the *Highhouse* opinion at all leads the court to decline to extend its reasoning to the end-of-season compensation in this case, which bears more similarities to the annual bonus in *Highhouse*.

Plaintiff's position also draws some support from *Prime Mortgage USA, Inc. v. Nichols*, 885 N.E.2d 628, 663-65 (Ind. App. 2008). The plaintiff in *Nichols* was one of the founders and a 50 percent owner of the employer, but she was also an employee. Her compensation was to be five basis points (0.05 percent) of the gross volume of the mortgage company each month, plus a car allowance and continued payment of an annuity. Plaintiff had not been paid for three months, and she sued under the Wage Payment Statute (along with many other claims). The defendant argued that the five basis point calculation was a bonus. The trial court and Court of Appeals agreed that the five basis points calculation was a wage so that the defendant was required to pay the past wages, plus double damages and attorney fees. The *Nichols* court criticized *Gress v. Fabcon, Inc.*, 826 N.E.2d 1 (Ind. App. 2005), for having failed to come to terms with the line of cases treating commissions as wages, but ultimately distinguished *Gress* on the ground that Nichols' five basis points could be calculated immediately each month and amounted to nearly all of Nichols' compensation, whereas *Gress* required later

calculations of profitability and the plaintiff received a base salary in addition to the commissions.

The *Nichols* criticisms of *Gress* point out how difficult this issue can be under Indiana law, but ultimately those criticisms are not persuasive. The *Nichols* court seemed to rely heavily on the label of compensation as commission or bonus, though the Indiana courts have repeatedly taught that the substance of the compensation arrangement would govern, despite contrary labels. *E.g.*, *Hansen*, 874 N.E.2d at 1072; *Gress*, 826 N.E.2d at 3; *Gurnik*, 587 N.E.2d at 709. Also, it is difficult to reconcile the *Nichols* approach to monthly compensation with the Wage Payment Statute's requirements that wages be paid at least twice monthly (or biweekly). In any event, the fact that Nichols' five basis points were paid every month as her regular compensation easily distinguishes this case, in which the end-of-season compensation was paid once a year as a supplement to Thomas' regular hourly wages.

## Conclusion

For the foregoing reasons, defendant's motion for summary judgment is granted. Final judgment will be entered accordingly.

So ordered.

Date: August 28, 2009

DAVID  F.  HAMILTON,  CHIEF  JUDGE
United States District Court
Southern District of Indiana

Copies to:

R. Anthony Costello
HUSCH BLACKWELL SANDERS, LLP
tony.costello@huschblackwell.com

Julianne Popper Story
HUSCH BLACKWELL SANDERS, LLP
julianne.popperstory@huschblackwell.com

David D. Robinson
SCOPELITIS GARVIN LIGHT & HANSON
drobinson@scopelitis.com

Ronald E. Weldy
WELDY & ASSOCIATES
weldy@weldylaw.com